**In the Matter of BALDWIN–UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.**

**Bankruptcy No. 1–83–02495.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 30, 1985.

**550**

Jacob Lewis, O'Melveny & Myers, Washington, D.C., for debtors.

Quarles & Brady, Milwaukee, Wis., Timothy Fischer, Cincinnati, Ohio, for claimants.

## ORDER

RANDALL, J. NEWSOME, Bankruptcy Judge.

This Chapter 11 contested matter is before the Court pursuant to Debtor Baldwin-United Corporation's ("Baldwin") filing of legal objections to claims arising out of the provisions of the 1974 "Employees' Stock Option Plan" ("Plan"), as amended, of MGIC Investment Corporation ("MGIC"). MGIC is a former Baldwin subsidiary which has been sold as part of the bankruptcy reorganization.

Oral argument on the objections and responses was heard June 21, 1985, after which the issues raised were taken under submission for decision.

The 1974 stock option plan authorizes the granting of options on MGIC common stock to key employees of MGIC and its subsidiaries exercisable for five years while the employee remains with the Company.[1] After MGIC and its subsidiaries were ac-

quired by Baldwin in December, 1981, the Plan was amended effective March 9, 1982 to make the options payable in stock of Baldwin instead. (Ex. 3 from June 21, 1985 hearing (Plan, ¶ 17(1)).

The stock option portion of the Plan has become valueless. The option prices provided by the Plan ($13.82 to $43.92 per share, or an average of $27.05 (Ex. 3)) greatly exceed the currently traded prices for Baldwin stock.

In addition to the stock option rights, the Plan as amended in 1982 provided a "cash option." The purpose of this provision was to induce option holders not to exercise their options to purchase shares of MGIC before Baldwin's acquisition of MGIC was completed. The amended Plan allows option holders the right to obtain a cash payment equal to (a) the number of shares covered by the option, multiplied by (b) the difference between the price per share of Baldwin's shares on March 9, 1982 ($54.75), and the option price. (Ex. 3, ¶ 17(2)). The right to obtain the guaranteed cash payment could not be exercised until sixty days before the option was to expire (Ex. 3, Summary of Plan at 3)

No additional options were granted under the Plan after the acquisition.[2] All rights under the Plan, therefore, including the cash payment rights, were granted before the filing of Baldwin's petition in bankruptcy on September 26, 1983. However, except as to one of the MGIC stock option claims (Claim # 117), the sixty-day period for exercise of the cash payment right occurred (or will occur) after September 26, 1983. Since the stock options are now worthless, the right to a guaranteed cash payment provides the only real basis for the MGIC stock option claims at issue here.[3] There were 177 claims filed by op-

---

1. An unexpired option continues for six months after the death of an employee for exercise by his legal representative. An option holder's rights also continue in full force and effect if employment is terminated (a) other than for cause or permanent disability or (b) by the employee as the result of a material diminution in his job responsibilities.

2. The Plan terminates on December 10, 1986, the last date on which any presently outstanding amended option is exercisable.

3. However, each claimant has reserved the right to increase the amount of his claim in the event the price of Baldwin's common stock increases beyond the option price plus the value of the guaranteed cash payment. (Ct.Doc. 14–3 at 4.)

tion holders for amounts ranging from $1544 to $57,019, or a total of $1,812,431.94 in such claims.

The first ground for Debtor's objections to these claims is primarily procedural. Debtor asserts that all of the MGIC stock option claims have been or will be assigned by the individual option holders to WMAC Investment Corporation, the entity which acquired MGIC, under an "Agreement and Plan of Acquisition and Assumption" dated November 30, 1984. The agreement obligates WMAC to purchase the option rights from tendering option holders at a price equal to the amount such option holders would be entitled to receive from Baldwin. At the present time we have been informed that 100 option holders have assigned their claims to WMAC. (See Ex. 2 and supplements) It is anticipated that the remainder of the claimants will assign their claims as they come due, before December 10, 1986.

Debtor requests that the name and address of the claimant on each of the MGIC stock options claims be stricken and the name and address of WMAC Investment Corporation be substituted as the real party-in-interest. WMAC does not challenge our authority to substitute it as the claimant on the MGIC stock option claims for those individual employees from whom such assignments have been received. (Response of WMAC, Ct.Doc. 14–2)[4]

Accordingly, this portion of Debtor's objection is hereby granted. The name and address of WMAC may be substituted on those claims which have been assigned previously to WMAC. Substitution will also be allowed as to those claims which are assigned prior to Dec. 10, 1986, to be carried out as the claims are assigned to WMAC.

Debtor objects next to allowance of the claims as an administrative priority expense under § 503(b)(1)(A). That section provides an administrative priority to the "actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." WMAC's response asserts that the stock option plan represents a form of compensation by Baldwin to key employees of a valuable subsidiary. A similarity to severance pay, which was allowed an administrative priority in cases such as *In re Unishops, Inc.*, 553 F.2d 305 (2d Cir.1977), is alleged.

■ We do not agree that the MGIC stock option claims are entitled to an administrative priority under § 503(b)(1)(A) or § 507(a)(3).[5] As a factual matter the stock option rights are not in the nature of wages; nor are they analogous to severance pay which has been granted an administrative priority for employees terminated due to the debtor-in-possession's actions.[6]

The stock option rights given to key employees in 1974 were intended to promote continuity of management and stock ownership in the company. (Ex. 3 at A–1) The Plan was designed as a "perk" for management employees to enhance the attractiveness of their employment, as well as to increase their personal stake in the welfare of the company.[7] The additional cash op-

---

**4.** None of the individual MGIC stock option claimants filed any responsive pleadings in this contested matter. The non-consenting response of WMAC purports to be filed on its own behalf and on behalf of all the individual claimants on Exhibit A to debtors objection. (Ct.Doc. 14–2)

**5.** We would agree, however, that assignment of the claims to WMAC does not alter the characteristics of those claims as they existed in the hands of the individual claimants. *See e.g., In re Missionary Baptist Foundation of America,* 667 F.2d 1244 (5th Cir.1982).

**6.** While rights under the Plan continue upon termination of employment under certain cir-

cumstances, none of the MGIC stock option claims asserts a right to severance pay resulting from termination of employment.

**7.** We note that prior to amendment of the Plan in 1982, there was no guarantee that this perk would remain valuable, as in fact it did not. In addition, those employees who did exercise their stock options would now be equity security holders of Baldwin, members of a group which has suffered severe losses. To distinguish those current option holders who failed to exercise their stock options and find they hold administrative priority claims would be inequitable and illogical.

tion right provided by the amended plan also had a specific purpose: to discourage exercise of the options before the acquisition, by guaranteeing the value of the options thereafter. Neither the purposes for the Plan nor its manner of exercise suggest it was meant to serve as a form of compensation for continuing services rendered or termination of employment.

■ The MGIC stock option claims also do not meet the two-part test for administrative priority set forth in the case law.

> A claim will be afforded administrative priority under § 503 if the debt both (1) "arises from a transaction with the debtor-in-possession" and (2) "is beneficial to the debtor-in-possession in the operation of the business."

*In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984) *citing In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976).

These claims do not pass the first prong of the test. The claims arise solely from obligations of MGIC and Baldwin incurred prior to the filing of Baldwin's bankruptcy petition on September 26, 1983. That the cash option rights of all but one claimant become exercisable post-petition does not change the analysis:

> There is ... substantial authority for the complementary propositions that administrative priority is not available where the debtor becomes bound to honor an obligation prepetition, regardless of when the amount owed becomes due; that the prepetition debtor and the debtor-in-possession are distinct entities; and that priority statutes must be strictly construed.

*In re Baldwin-United Corp.*, 43 B.R. 443, 453 (S.D.Ohio 1984). *See also, In re Jartran, supra.*

While the debtor-in-possession here most likely derived a benefit from the continued employment and loyalty of MGIC employees (if it can be attributed to the existence of the Plan), it was not the debtor-in-possession which induced such performance. This factor is fatal to the administrative priority claimed.

Accordingly, debtor's objection to administrative priority for such claims is hereby GRANTED.

■ The obvious question remaining is how to characterize the MGIC stock option claims. The common stockholders' committee urges us to find that these claimants hold no more than "equity securities" as defined in 11 U.S.C. § 101(15):

> (A) share in a corporation, whether or not transferable or denominated "stock," or similar security;
>
> . . . .
>
> (C) warrant or right, ..., to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) ... of this paragraph.

WMAC admits that the stock option portion of the plan consists of a five year right, vested in full from the date of the option, to purchase a fixed amount of Baldwin stock and therefore falls under § 101(15). (Ct.Doc. 14–8 at 2)

This is our conclusion as well. We hold therefore that claims to exercise the stock option portion of the Plan (as opposed to the cash option right) are properly classified as equity security interests.

■ The cash surrender rights are a different matter however. In exchange for the option holders' forebearance from exercising their stock options prior to the acquisition of MGIC, Baldwin granted the option holders a guaranteed right to a cash payment in the future. As these rights mature and are exercised, the option holders become unsecured creditors of Baldwin. Accordingly, we find that the option holders (and WMAC as assignee) hold general unsecured claims against Baldwin for the amount of the cash payments to which they are entitled under the Plan. *See*, 11 U.S.C. § 101(4) and (11).

Finally, Baldwin requests an order expunging, disallowing and denying each of the MGIC stock option claims listed on Exhibit 1 as "Duplicate MGIC Stock Option Claims" because they are duplicative of the corresponding claims listed on Exhibit 1 as

surviving claims. This relief is GRANT-ED.

For the foregoing reasons, debtor's objections to the MGIC stock option claims are hereby GRANTED.

IT IS SO ORDERED.