**In re EINSTEIN/NOAH BAGEL CORP., et al., Debtors.**

**Nos. 00–04447 ECF–CGC, 00–04448 ECF–CGC.**

United States Bankruptcy Court, D. Arizona.

Aug. 7, 2000.

Charles R. Sterbach, Joseph E. Cotterman, Gallagher & Kennedy, P.A., Phoenix, Arizona, for debtors.

J. Eric Ivester, Alesia Ranney–Marinelli, John K. Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, Illinois, for debtors.

Richard F. Levy, Theodore J. Low, Benjamin D. Schwartz, Brandy A. Sargent, Altheimer & Gray, Chicago, Illinois, for Bagel Store Development Funding, L.L.C.

Carolyn J. Johnsen, Hebert, Schenk & Johnsen, P.C., Phoenix, Arizona, for Official Committee of Unsecured Creditors.

Dennis J. Connolly, Candace Smith, Mark Duedall, Alston & Bird, L.L.P., Atlanta, Georgia, for Official Committee of Unsecured Creditors.

John J. Fries, Ryley, Carlock & Applewhite, P.A., Phoenix, Arizona, for Bank of America.

## UNDER ADVISEMENT ORDER RE: "PUT RIGHT"

CHARLES G. CASE, II, Bankruptcy Judge.

### I. Introduction

This Order resolves several related matters. First, Einstein/Noah Bagel Corp. ("ENBC") and Einstein/Noah Bagel Partners, L.P. ("Bagel Partners"), (collectively "Debtors"), filed their "Motion for Order Pursuant to Bankruptcy Rule 3013 Determining Classification Contained in the Debtors' Joint Plan of Reorganization" on May 10, 2000 (the "Rule 3013 Motion"). The Rule 3013 Motion seeks an order that Debtors have properly classified Bagel Store Development Funding's ("Bagel Funding") Unit Rights, which includes Ba-

gel Funding's Put Right, in Class 6a (an equity class) of the Bagel Partners' Chapter 11 case. Second. Bagel Funding filed a Proof of Claim/Interest against both Debtors, to which Debtors and the Official Committee of Unsecured Creditors (the "Committee") objected, raising essentially the same issues. At bottom, this dispute is about whether the "Put Right" granted to Bagel Funding under the Limited Partnership Agreement (the "Agreement") gives rise to a claim against, as opposed to an equity security interest in, either or both Debtors. The Court concludes that, under any construction, it does not as to Bagel Partners and that even if it were construed to do so against ENBC, any such claim would be subordinated in the ENBC case to the rights of unsecured creditors pursuant to 11 U.S.C. section 510(b) of the Bankruptcy Code. Therefore, the Rule 3013 Motion will be granted, and the objections to the Proofs of Claim/Interest will be sustained as more fully set out in this Order.

## II. Facts

### A. History of the Put Right[1]

Boston Chicken, Inc.[2] owns approximately 51% of the outstanding equity of ENBC. The remaining equity is publicly held by approximately 700 registered holders. ENBC in turn owns approximately 77% of the limited partnership units ("Units") in Bagel Partners. The remaining Units are owned primarily by Bagel Funding.[3] Bagel Funding was an investor in ENBC's former area developer franchisees, which merged into Bagel Partners in

December of 1997. ENBC developed its business of specialty retail bagel stores by concentrating on local markets through a system comprised of several franchised area developers. The area developers were financed in part by ENBC.

By 1997, the area developers owed ENBC over $330 million. This debt was secured by the assets of the area developers and was, at ENBC's option, convertible into equity of the area developers. In 1997, the four area developers merged into a single surviving area developer, Bagel Partners. The 1997 transaction occurred approximately seven months after ENBC issued its 7 1/4% Convertible Subordinated Debentures, the proceeds of which were used in part to fund the loans to the area developers. As part of the 1997 transaction, Bagel Funding and former management of the area developers received approximately 21.5% of the Units, while ENBC received approximately 77% of the Units in exchange for its $330 million in convertible loans and an additional $29 million contribution to Bagel Partners. The remaining 1% of the equity is held by the General Partner, Einstein Noah Bagel Partners, Inc. ("ENBPI"), a non-debtor wholly owned subsidiary of ENBC. The rights of the partners are set forth in the December 5, 1997, Limited Partnership Agreement.

At issue is one of the provisions in the Limited Partnership Agreement denominated the "Put Right." Pursuant to the Put Right, Bagel Funding may, subject to a number of temporal and substantive conditions, require that its interest be pur-

---

1. At the hearing, the Court granted the Committee's motion in limine to exclude extrinsic evidence, determining that the constituent document, the Limited Partnership Agreement, is unambiguous within the meaning of Delaware law and that extrinsic evidence to prove what the document means or what the parties intended would be inadmissible. The Court did admit certain background documents and deposition testimony for the limited purpose of establishing the historical context within which this transaction arose. Likewise, the history set forth here is for the

purpose of establishing context only and not for the construction of the Agreement.

2. Boston Chicken, Inc. has been dissolved pursuant to its confirmed plan of reorganization (Case No. 98–12547–ECF–CGC, docket 1795). This equity interest is now held by the Plan's liquidating trustee.

3. According to Bagel Funding, it holds 89,-450,000 limited partnership units in Bagel Partners.

chased at a price determined by an agreed formula. At Bagel Partners' election, the purchase price may be paid in cash, common stock of ENBC, or both by either itself or ENBC. The Put Price is calculated according to a formula equal to 6.5 times annual post-royalty store level cash flow reduced by any outstanding indebtedness (and increased by any cash) of Bagel Partners. Debtors believe that the Put Price, as calculated on the petition date, is approximately $54.4 million.

If ENBC or Bagel Partners elects not to deliver cash, or if their loan agreements do not permit them to deliver cash (as is in fact the case), the only means of satisfying the Put Price is with ENBC Common Stock. If neither sufficient cash nor sufficient ENBC Common Stock can be delivered to satisfy the Put Right in full, then the Put Right is deemed unexercised to the extent of the insufficiency, leaving Bagel Funding with its remaining partnership interests in Bagel Partners.

### B. Debtors' Rule 3013 Motion

This case is fundamentally about the Debtors' balance sheets: in other words, the Debtors' primary need is not an operational restructuring but rather a financial restructuring to address excessive leverage in ENBC and the capital structure of both entities. To bring these issues into focus, the Debtors filed their Rule 3013 Motion, arguing that the Put Right is an equity security interest and not a claim as each of those terms is defined in 11 U.S.C. section 101. Therefore, Debtors seek to classify all of Bagel Funding's rights, claims and interests, including its Put Right, into one equity class, Class 6(a), in the Bagel Partners case. Bagel Funding objects, arguing its Put Right is not sub-

stantially similar to the other claims or interests it holds and that its Put Right is separate from and adds additional value to its Units.[4]

Under the Debtors' proposed Joint Plan of Reorganization, general unsecured creditors of ENBC (primarily the debenture holders) and Bagel Partners' limited partners (primarily Bagel Funding and excluding ENBC) will receive approximately 89% and 11%, respectively, of the total outstanding equity of a combined, reorganized ENBC/Bagel Partners (the "New Common Stock"), subject to dilution under certain circumstances (such as a management incentive plan).[5] At this time, neither the Committee (on behalf of the debenture holders) nor Bagel Funding has agreed to this proposal, each arguing that its constituency is entitled to a larger share of the value of the proposed reorganized and merged Debtors. The currently outstanding ENBC Common Stock will be canceled under the Plan, and existing ENBC equity holders will receive warrants for 2% of the New Common Stock (on a fully diluted basis), exercisable when the New Common Stock reaches a price at which the debenture holders will have recovered the value of their outstanding claims in full.

### C. Proofs of Claim

Bagel Funding has filed a "Proof of Interest and/or Claim" against Bagel Partners for the an unliquidated claim comprised of (i) Bagel Funding's 89,450,000 Limited Partner Units in Bagel Partners and (ii) the $54.4 million it alleges is due it from Bagel Partners under the Put Right.[6] In addition, Bagel Funding filed a Proof of Claim against ENBC for breach of contract, claiming that ENBC may also be

---

4. Bagel Funding also filed a breach of fiduciary duty claim against Bagel Partners and a breach of contract claim against ENBC. Those will be discussed below.

5. In addition, ENBC's and Bagel Partners' trade creditors will be paid in full in the ordinary course of business during and after the reorganization cases. Other creditors of Bagel Partners will be paid in full capped

amounts of their claims upon emergence either in cash, New Common Stock, or a combination thereof.

6. Bagel Funding acknowledges that the issue of whether its Put Right gives rise to a claim or interest is yet to be resolved and is the subject of Debtors' Rule 3013 motion to classify.

liable to Bagel Funding on account of the Put Right. Bagel Funding acknowledged in the Proof of Claim that it is not entitled to double recovery pursuant to its Put Right.

Bagel Fund also filed a third Proof of Claim against ENBC for breach of fiduciary duty "for any and all claims it may have against Debtor for any of its acts or acts which caused to be done by the general partner of Bagel Funding which breached the fiduciary duty owed to Bagel Funding" to which Debtors and the Committee objected. Subsequently, Bagel Funding unilaterally "withdrew" this Proof of Claim allegedly without prejudice to asserting it again in the future depending on resolution of the Put Right issues and without prejudice to asserting similar claims against non-debtor third parties. Debtors and the Committee objected to the unilateral withdrawal on the grounds that Bankruptcy Rule 3006 prohibits withdrawal of a proof of claim without court approval once objections have been filed and the creditor has participated significantly in the case. The Court deferred ruling on the withdrawal and it will now be addressed in this Order.

Debtors and the Official Unsecured Creditors Committee filed similar objections to the remaining Proofs of Claim/Interests. Thereafter, the Debtors, the Committee and Bagel Funding filed comprehensive briefs on the Put Right issues and a plenary hearing was held on July 20, 2000 at which time the matter was taken under advisement.

## III. Analysis
### A. The Issue Presented

The issue presented by this case is whether this "Put Right" held by Bagel Funding is either a claim against or interest in Bagel Partners, ENBC or both.

Bagel Funding has styled the issued somewhat differently. In its words, the issue to be decided is whether the Put Right "adds value to [Bagel] Funding's minority interest" in the partnership. This statement of the issue, however, begs the question. Without first determining whether the Put Right is a "claim" or an "equity security interest," it is impossible to know what impact, if any, any additional "value" represented by the Put Right will have on the proposed Plan of Reorganization in this case.

Under the Plan, ENBC, a corporation, is proposed to merge with Bagel Partners, a limited partnership. No one contests that Bagel Funding owns a 21.5% equity interest in Bagel Partners. The rub in this case is how the equity in the proposed reorganized Debtor, the product of the merger, will be divided among Bagel Partners and the creditors of the two estates, particularly the holders of the $125 million public subordinated debentures. While that question is a battle for another day, that battle cannot occur until the Bagel Funding's rights are determined.

The combatants here are the Debtors and the Committee on one side, each arguing that the Put Right is an equity security interest, and Bagel Funding on the other, arguing that the Put Right either is a "claim" or that, at the least, it adds "value" to its minority limited partnership interest in Bagel Partner above and beyond the "value" of the Units.

### B. First Principles

Bagel Partners is a Delaware limited partnership. Bagel Funding is a Delaware limited liability company. Without question, both entities are creatures of Delaware law, and in particular Delaware statutes. Further, the Partnership Agreement provides that it is governed by Delaware law. *See* Partnership Agreement at § 10.2 and at § 1.1 (providing the Partnership Agreement is governed by the Delaware Revised Uniform Limited Partnership Act). As a result, Delaware law is applicable to the construction of the documents, including the effect of the Put Right. *See, e.g., HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185 (3d Cir.1996) (applying Delaware law to a

dispute over capital contributions required by a Delaware limited partnership).

■ In connection with this dispute, the key principle is that, in determining what the terms of a contract actually mean, "[t]he true test is not what the parties to the contract intended it to mean, but what a **reasonable person** in the position of the parties would have thought it meant." *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992) (emphasis added). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

■ In this case, Bagel Funding sought to introduce extrinsic evidence to illuminate the meaning of the Agreement's provisions relating to the Put Right. After briefing and argument from the parties, the Court denied that request and excluded extrinsic evidence from this record, relying upon Delaware's parol evidence rule. To that end, Delaware follows the general rule that a court interpreting any contract must give effect to all terms of the instrument, must read the instrument as a whole and, if possible, must reconcile all the provisions of the instrument. *See Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del.1998); *see also Warner Communications Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 967 (Del.Ch.), *aff'd* 567 A.2d 419 (Del.1989) (holding that a contract "should be construed in its entirety, and an attempt should be made to reconcile all of [its] provisions in order to determine the meaning intended to be given to any portion of it." (citation omitted)). Therefore, the first step in the analysis is to apply these principles to determine what the Agreement means. The second part of the analysis will be to put that conclusion within the legal context of the Bankruptcy Code.

## C. The Agreement

■ The critical section of the Agreement is Section 4.7. Section 4.7(a) provides that, upon giving notice and the subsequent non-occurrence of certain events, "the Fund shall have the right [for a stated period of time], on the other terms and subject to the conditions set forth herein (the "Put Right"), to require the Partnership or ENBC to purchase all but not less than all the Units owned by the Fund at the Put Price." The Fund may exercise Put Right by giving written notice to the Partnership or ENBC of such exercise (the "Put Notice")." Section 4.7(a) further provides that "[t]he Put Right is personal to the Fund it may not be sold or assigned upon the dissolution of the Fund or otherwise."

Section 4.7(b) provides the formula for calculating the Put Price. Roughly put, the Put Price is 6.5 times income from store operations. The parties agree that, calculated as of the time of the filing, the Put Price would be approximately $54.4 million.

Section 4.7(c) provides the mechanism for the payment of the Put Price. Critically, Section 4.7(c) provides that upon "exercise of the Put Right, the Units owned by the Fund shall be purchased by the Partnership or ENBC, **as selected by the Partnership,** within 60 days of the Put Date. At the election of **such purchaser,** the Put Price may be paid in (i) cash, (ii) shares of ENBC common stock, par value $0.01 per share (the "Common Stock") or (iii) any combination of the foregoing." (Emphasis added). Therefore, although Section 4.7(a) provides that Bagel Funding will have the right to require Bagel Partners or ENBC to purchase the Units, Section 4.7(c) makes it clear that the choice of purchaser lies with Bagel Partners. Therefore, reading Sections 4.7(a) and 4.7(c) together, the unambiguous conclusion is that while Bagel Funding may require its shares to be purchased, it may

not denominate who the purchaser will be. Further, once the purchaser has been selected, that purchaser then decides the nature of the "currency" to be used to pay the Put Price.

Notwithstanding these provisions, however, Bagel Funding argues that the "mere designation of ENBC as the purchaser does not relieve the Partnership of its obligations under Funding's Put Right." To the contrary, the Court concludes that it is not a fair reading of the Agreement to conclude that Bagel Funding has an independent right assertable against Bagel Partners in the event Bagel Partners denominates ENBC as the purchaser. Once ENBC has been so designated as the purchaser, the Agreement does not suggest in any way that Bagel Partners has any continuing obligation of any sort. Therefore, the Court concludes that Bagel Funding's argument that it retains an independent claim against Bagel Partners, regardless of the designated purchaser, is without merit.

Section 4.7(c) further provides that if the price is to be paid in ENBC common stock, the number of shares will be determined by dividing the Put Price by a calculated dollar amount designed to represent an average recent closing price. Finally, ENBC agrees that it will use its reasonable best efforts to register such shares for resale, although the Partnership Agreement contains no absolute obligation to accomplish the registration.

Section 4.7(e) specifically addresses the issue of what happens if the payment of the Put Price in cash is not possible due to restrictions under loan documents [7] and ENBC is incapable of issuing a sufficient number of shares to satisfy the Put Price without first obtaining prior approval of ENBC's stockholders. In that event, ENBC's obligation is to issue the maximum number of shares that it is authorized to issue and to use its reasonable best efforts to obtain approval of the stockholders to issue additional shares. In such event, the Put Right will be deemed exercised to the extent that shares can be issued and the limited partnership in Bagel Partners will remain intact to the extent that the full Put Price is not satisfied. Upon obtaining shareholder approval, the remainder of the shares are to be issued. Although the Agreement does not specifically so state, the necessary implication is that, if such shareholder approval cannot be obtained, and payment in cash is prohibited, then Bagel Funding will retain its pro rata number of Units in Bagel Partners to the extent of such nonpayment until such time, if ever, as shareholder approval is in fact obtained. There is nothing in Section 4.7(e), or elsewhere in the Partnership Agreement, that suggests that in such a case, either Bagel Partners or ENBC would be liable to satisfy the unpaid portion of the Put Price in cash.[8]

Finally, Section 4.7(f) provides that the "Fund's exercise of the Put Right **together with the Partnership or ENBC's payment of the Put Price** shall constitute a complete release by the Fund of the Partnership, the General Partner, the Part-

---

7. Section 10.14 makes it clear that the parties understood and contemplated that the secured loan agreement may limit a partner's ability to exercise its rights or realize any benefits, including any benefit under the Put Right. Indeed, Section 10.14 requires disgorgement of any amounts received in violation of such a restrictive covenant. Thus, it is indisputable that all parties knew that if the secured loan agreement prohibited use of the Debtor's cash for the purpose of paying the Put Right, as it does, they would be bound by that restriction. Section 6.3 similarly recognizes that the secured loan agreements could prohibit other cash distributions to limited partners.

8. For example, Section 9.3 provides no liquidation preference to Bagel Funding attributable to its rights under the Put Right. There is no provision that provides an enhanced return to Bagel Funding either because of the Put Right or in the event the Put Right is exercised but unsatisfied. Rather, partners receive distributions upon liquidation in accordance with their capital accounts which themselves are unaffected by the Put Right.

ners, ENBC and their Affiliates of all claims or rights arising out of, or on account of, the ownership of Units by the Fund." (Emphasis added). Pursuant to this provision, ENBC's and Bagel Partners' obligations with respect to the Units will be released only upon full payment of the Put Price. It is necessary, however, to read this section in connection with Section 4.7(c). Under that section, the purchaser is to be selected by Bagel Partners. In the event ENBC were selected and was unable to issue sufficient stock, then the only remaining obligation of either Bagel Partners or ENBC would be continued efforts to obtain consent to issue sufficient shares or, at its election, to pay any remaining amount from unencumbered cash. It is inconsistent with the Agreement as a whole to conclude, as suggested by Bagel Funding, that the reference in the release provisions of Section 4.7(f) to Bagel Partners necessarily means that Bagel Partners would have continuing liability in the event ENBC failed to perform. The Agreement could have so provided but in fact did not.

### D. The Bankruptcy Code

Section 101 addresses the issue of what is a "claim" and what is an "interest." Section 101(5) states plainly that "claim" means—

A. right to payment ...; or

B. right to an equitable remedy for breach of performance if such breach gives rise to a right to payment.

 It is beyond question that Congress intended the definition of "claim" to be as broad as possible, making clear that it does not matter whether the claim is reduced to judgment, liquidated, unliquidated, contingent, matured and so on. For purposes of this case, the significance of claim status is that claims are entitled to priority over equity security interests. *See* 11 U.S.C. §§ 726, 1129(a)(7), and 1129(b)(2)(B)(ii). Notwithstanding the broad definition, the touchstone of any "claim" is a "right to payment" and that is

the background against which the Put Right must be examined, both as to Bagel Partners and to ENBC.

Section 101(16) likewise contains the definition of the equity security and provides that:

"equity security" means—

\* \* \* \* \* \*

(B) interest of a limited partner in a limited partnership; or

(C) ... right ... to ... sell ... [an] interest of a kind specified in subparagraph ... (B).

No party contests that Bagel Funding's underlying limited partnership interest as represented by the Units is an equity security. The question is whether the Put Right falls within the definition of section 101(16).

### 1. The Put Right as to Bagel Partners

Bagel Funding is an equity security holder in Bagel Partners. The Put Right gives it the right to require that its equity interest be purchased either by Bagel Partners or ENBC at Bagel Partner's option. As noted, the Partnership Agreement itself provides that the Put Right is a nontransferable and non-assignable right. Section 7.3 of the Partnership Agreement prohibits sale of the Units without the consent of ENBC and subject to several other conditions. Therefore, within the four corners of the document, it is clear that the Put Right was intended as a liquidity device, a method of providing to Bagel Funding a mechanism for liquidating its otherwise illiquid investment. However, that method does not include a "right to payment" in cash as required by 11 U.S.C. section 101(5); rather, that method only gives Bagel Funding a right to sell its Units at a specified price with the payment in cash or stock wholly out of its hands. This set of rights falls squarely within the contours of section 101(16).

Bagel Funding suggests that there is sufficient difference between the right to require the purchase of its Units and its right to sell its Units such that its Put Right would fall outside the ambit of section 101(16). This is a distinction without a difference. The fact that Bagel Funding's right to sell its Units is limited to two specified purchasers limits rather than expands its right to sell and in no way takes the nature of the transaction out of the definition contained in section 101(16).

Indeed, as suggested by several cases cited by the parties, even if the Put Right could be construed to contain an obligatory cash payment component (which it does not), that would not change its nature from an equity security to a claim because **at the time the case was filed,** the right to receive the cash would not have matured because the Put Right itself had not yet become exercisable, a fact that is undisputed in this litigation. *See In re Search Financial Services Acceptance Corp.,* 2000 WL 256889 (N.D.Tex. March 7, 2000); *In re Baldwin–United Corp.,* 52 B.R. 549 (Bankr.S.D.Ohio 1985).

Therefore, the Court concludes that the Put Right is an equity security in the Bagel Partners case.

### 2. The Put Right as to ENBC

Bagel Funding premises its argument that it has a claim against ENBC on the notion that ENBC is contractually obligated, pursuant to the Agreement, to deliver "value" equivalent to the Put Price in the event the Put Right is exercised and Bagel Partners denominates ENBC as the purchaser. The Agreement itself does not support such a conclusion. As discussed above, ENBC's obligation is to deliver as much stock as it can in satisfaction of the Put Price and thereafter to use its reasonable best efforts to obtain shareholder approval to issue additional stock sufficient to satisfy the Put Price. In the event it is unable to do so, the result is not a "right to payment" against ENBC, but rather the retention by Bagel Funding of a percent-

age of the Units of Bagel Partners representing the portion that ENBC was unable to purchase and the retention of a continuing right to require ENBC to provide sufficient stock. Section 4.7(f) makes clear that Bagel Funding would have a continuing right to require ENBC to provide sufficient stock. In light of the complete absence of any cash obligation on the part of ENBC, this provision reflects the reality that the transaction would simply be uncompleted, not that there would then come into being a "right to payment" of Bagel Funding against ENBC.

Therefore, the Court concludes that because there is no enforceable "right to payment" in favor of Bagel Funding against ENBC, any rights that Bagel Funding may have do not give rise to a "claim" within the meaning of 11 U.S.C. section 101(5). Rather, the Put Right is more appropriately classified as a right of Bagel Funding to purchase stock of ENBC, thereby invoking section 101(16) instead.

■ Although this analysis is sufficient to resolve the matter, further analysis under section 510(b) bolsters the result.

Section 510(b) provides that "a claim … for damages arising from the purchase or sale of [a security of the debtor or an affiliate of the debtor] … shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security." Bagel Funding argues that this statute is not applicable to its "claim" against ENBC because (1) Bagel Funding's claim is not the statutorily defined type of claim subject to subordination, and (2) ENBC's creditors are not within the statutorily defined classes that receive the benefit of subordination. On the face of it there is some force to these arguments; however, upon closer inspection, they do not prevail.

The Put Right can be characterized either as Bagel Funding's right to require ENBC (if designated by Bagel Partners) to purchase its Units for ENBC stock. It

also can be characterized as ENBC's obligation to issue, or "sell," shares of ENBC to Bagel Funding in exchange for those Units. In the first case, the "security" to which section 510(b) applies would be the Units held by Bagel Funding; in the second case, the "security" would be the shares of ENBC stock that are to be transferred to Bagel Funding. In order for section 510(b) to apply, two requirements must be met. First, the claim must be of a type that falls within the scope of section 510(b) and, second, the equity security interest out of which such claim arose must be of a type that would be otherwise junior to the claims that are the beneficiaries of the subordination.

As to the first point, it is not difficult to conclude that the statute is applicable. The securities involved are either the Units in Bagel Partners, an affiliate of ENBC[9] and therefore within the scope of the statute, or the shares of ENBC, securities that are clearly within the scope of the statute. If the claim asserted is construed to be the breach by ENBC of its contractual obligation to sell its shares to Bagel Funding, then there is no difficulty in finding that the "interest" to which the claim relates is otherwise junior to the creditors of ENBC.

Only if the "security" to which the claim relates is construed to be the Units of Bagel Partners does Bagel Funding's argument have any resonance. However, even in those circumstances, the cases construing section 510(b) teach us that a liberal construction of section 510(b) is in keeping with Congress' purposes in enacting this section.

Viewed in this way, any such claim would fall within the contours of section 510(b). This is because ENBC's obligation to "purchase" Bagel Funding's Units is solely limited to the issuance of stock. As noted above, there is no enforceable obligation on behalf of Bagel Funding to re-

quire ENBC to buy the Units in cash. Therefore, from the perspective of the creditors entitled to subordination (broadly speaking, the holders of the debentures), not subordinating any such claim would subvert the purposes of section 510(b). This is because the debenture claims would end up *pari passu* with claims arising solely out of the failure of the Debtor, ENBC, to issue stock. That is precisely the type of claim that is the target of the subordination provisions of section 510(b).

Bagel Funding argues that it is not enough merely that the claim to be subordinated be held by a equity security holder—a so-called "but for" argument. The "but for" argument has been properly rejected by courts such as *In re Amarex, Inc.*, 78 B.R. 605 (Bankr.W.D.Okla.1987). However, as parsed above, that is neither the Debtor's argument nor the Court's conclusion. Here, the critical point is that the claim arises because of the inability to sell or the failure to purchase the security itself, not merely because the party asserting the claim may hold an equity security of the Debtor.

In sum, Bagel Funding does not have a claim against ENBC because it has no enforceable right to payment from ENBC. However, even if it could be so construed, any such claim would fall within the subordination provisions of section 510(b) and therefore would be appropriately classified as an equity security interest in both Debtors' cases.

### 3. Bagel Funding's other arguments

Against these conclusions, Bagel Funding makes a number of other arguments. First, it argues that it would "pervert" the intent and expectations of the parties to allow the Put Right to be satisfied with "admittedly worthless stock." This argument misses the point. The appropriate analysis is not to assume the worst and

---

9. ENBC, through ENBPI, its wholly owned subsidiary, "controls" or indirectly "owns" twenty percent or more of the outstanding voting securities (the general partner interests) of the Debtor, Bagel Partners. 11 U.S.C. § 101(2).

then conclude that such a result should not be allowed. Rather, the correct approach is to analyze the rights of the parties based on the Agreement regardless of the value of the stock. Here, the Put Right would be an equity security, and not a claim, whether the stock were trading or quoted at the time of the petitions at $.05, $5.00 or $500.00. It simply does not matter from the standpoint of the Bankruptcy Code. Next, Bagel Funding argues that the Put Right has substantial "value" because even if ENBC stock is currently trading at a very low price, it will undoubtedly have much greater value post-confirmation because of the removal of the $125 million in debentures from ENBC's balance sheet. Therefore Bagel Funding suggests its Put Right should be viewed in the context of the shares of stock it could receive post-confirmation once exercised.

■ This argument is contrary to fundamental bankruptcy principles. First and foremost, with exceptions not relevant here, the rights of holders of claims and interests are fixed as of the date of the petition. *See* 11 U.S.C. § 502. As of the date of the petition in this case, the Put Right was unexercised and indeed was not ripe for exercise. Further, as an equity security interest, it is subject to cancellation under 11 U.S.C. section 1141(d)(1)(B) upon confirmation of a plan. If Bagel Funding were correct, the same argument could be applied to unexercised warrants or stock options that, although under water at the time of the filing, would have substantial value if they could "ride through" the bankruptcy and be exercisable against the reorganized debtor with a clean balance sheet. Many cases, among them *In re America West Airlines, Inc.*, 179 B.R. 893 (Bankr.D.Ariz.1995), teach us that this is not the law.

Next, Bagel Funding argues that, although ENBC's sole obligation under the Put Right was to issue stock if and when denominated as the purchaser, the Put Right bears none of the characteristics of an equity interest in ENBC. This is because the Put Price is solely tied to store operations (the Bagel Partner level, in Funding's view) and not to the overall financial health of ENBC. Thus, because the number of shares of ENBC stock that Funding would receive is simply a matter of mathematical calculation based upon the stock's closing price at the time of exercise and the Put Price, the Put Right does not bear the classic qualities of "equity" vis à vis ENBC.

First, this argument is disingenuous. Bagel Funding unequivocally agreed that the Put Price could be paid in ENBC stock, after which, at the least, its fortunes would be tied to those of ENBC. And, although there is a best efforts obligation to register the stock, there is no absolute obligation, thereby leaving open the possibility that Bagel Funding would go from one illiquid investment to another. Second, while store level operations take place mainly at the Bagel Partners level, it ignores reality to suggest that they are independent of ENBC, its resources, its licenses, its employees and its contracts. Finally, it does not really matter. As to Bagel Partners, the Put Right is clearly an equity security. As to ENBC, even if it were construed to be a claim, it is subject to subordination under section 510(b) for the reasons stated above. Therefore, whatever the formula for determining the price, the result is the same.

Next, Bagel Funding argues that the Put Right must produce a claim if there is either insufficient stock to be issued or the stock is worthless. Again, as noted above, the construction that the Limited Partnership Agreement itself does not support this conclusion and this set of circumstances clearly could have been addressed by the parties. For example, they could have negotiated an agreement pursuant to which one or both of the Debtors would have a monetary obligation to pay any unexercised portion of the Put Right. This provision is conspicuously absent from the Agreement. This is particularly glaring in light of the fact that the Agree-

ment does address what ENBC's obligations are if there is insufficient stock to pay the Put Price and nowhere is there a suggestion that those obligations include a monetary payment.

■ Finally, Bagel Funding argues that the Debtors cannot rely upon the issuance of stock alternative because it would violate section 365(c)(2). This argument is a red herring. First, there is no attempt by the Debtor to assume the contract and, second, even if the contract were assumed, Bagel Funding could not be forced to accept securities of the Debtor because it could simply refuse to exercise the Put Right. Here, the Put Right is contained within the larger context of a partnership agreement. The Put Right itself, when analyzed on its own terms, falls squarely within the definition of equity security interest and that is the context in which it needs to be analyzed.

### E. The issue of the Put's Right's "value"

This Order concludes that the Put Right is an equity security in the Bagel Partners case and that it is not a claim in the ENBC case. However, it does not address whether the Put Right adds any incremental value to the 21.5% in equity interests undisputedly owned by Bagel Funding. This issue need not be addressed to resolve the Rule 3013 Motion; the sole relief sought there is an order that the Class 6(a) classification is appropriate. However, the objections to the Proofs of Claim/Interest do inferentially seek a determination that the Put Right is "worthless." To this, obviously, Bagel Funding objects.

The issue of value may be important in the context of confirmation; if the Put Right does add incremental value to the Units, then Bagel Funding can argue it is entitled to a larger piece of the pie.[10] Certainly, some of the provisions of the Agreement suggest that there is no incremental

value—e.g., the lack of either additional consideration or a preference upon liquidation arising from the Put Right (section 9.3), the non-transferability of the Put Right (section 4.7(a)) and the Units themselves (section 7.3), and the lack of a monetary remedy upon failure to satisfy the Put Price (section 4.7(e)). However, the Court concludes that it is neither necessary nor appropriate to resolve that issue in the absence of evidence on that subject now that the nature of the right has been established. Unless any party seeks and receives an order to the contrary setting such a determination for earlier consideration, any such evidence or arguments will be considered only at confirmation.

### F. The Breach of Fiduciary Proof of Claim

■ Bagel Funding originally filed a breach of fiduciary duty claim against ENBC, presumably based upon its 100% ownership of ENBPI, the corporate general partner of Bagel Partners. Subsequently, Bagel Funding filed a unilateral withdrawal of its fiduciary claim against ENBC. Both the Committee and the Debtors objected, correctly arguing that Bankruptcy Rule 3006 provides that a claim may only be withdrawn pursuant to Court order on such conditions as the Court deems proper in a circumstance where an objection has been lodged and the party has substantially participated in the case. Both of those criteria are met in this case. Therefore, both the Committee and the Debtors asked the Court to condition the withdrawal upon an express order that Bagel Funding may not assert against these Debtors any such claim for fiduciary duty in the future, whether by amendment or otherwise. Bagel Funding acknowledges that this is the correct result and it is so ordered.

But, both the Committee and the Debtors want more. They ask that the Court

---

10. Of course, the Court is cognizant of the Committee's argument that Bagel Funding is entitled to none of the reorganized pie regard-

less of the "value" of its equity position in Bagel Partners.

further condition the withdrawal of the claim upon an order that would preclude Bagel Funding from asserting fiduciary duty claims arising out of Put Right issues against non-debtor parties such as ENB-PI. The rationale is that such claims could give rise to indemnity or reimbursement claims against the Debtors, thereby allowing Bagel Funding to do through the back door what it is not allowed to do through the front.

The Court declines to go so far. Bagel Funding's argument that the Debtors and the Committee should be no worse off than they would have been had the claim never been filed makes sense in this context. The issue was never actually litigated; indeed, it was withdrawn in face of an order that it be restated with more specificity. No discovery has occurred and no findings, preliminary or otherwise, have been made. Any future ramifications of any future claims against non-debtors are better dealt with in a concrete rather than hypothetical context. Therefore the Court denies that request for this additional condition.

## IV. Conclusion

For the foregoing reasons, the Rule 3013 Motion is granted and the objections to Bagel Funding's Proofs of Claim are sustained. Further consideration of Bagel Funding's Proof of Interest in the Bagel Partners case is deferred to confirmation.

**So ordered.**