**In re JOBS.COM, INC.**

No. 01–41861–BJH–11.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Sept. 10, 2002.

**210**

John Y. Bonds, III, Shannon, Gracey, Ratliff & Miller, Ft. Worth, TX, Michael S. Britton, Shields, Britton & Fraser, Plano, TX, Steven John Coaty, Coaty Law Offices, Newport, RI, John Mark Chevallier, McGuire, Craddock, Strother & Hale, Michael W. Deeds, Linebarger, Goggan, Blair & et al., Dean W. Ferguson, Munsch, Hardt, Kopf, Harr & Dinan, Dallas, TX, Sherrel K. Knighton, Law Offices of Robert E. Luna, William Thomas McLain, Reagan & McLain, Alan K. Motes, Vinson & Elkins, Michael R. Rochelle, Rochelle, Elrod & Hutcheson, Hutton W. Sentell, Law Offices of Joseph E. Ashmore, Jr., Andrea Sheehan, Eric J. Spett, Munsch, Hardt, Kopf, Harr & Dinan, Louis Raymond Strubeck, Jr., Fulbright & Jaworski, Alan S. Trust, Trust.Law.Firm, P.C., Dallas, TX, Alan W. Kornberg, Allan J. Arffa, Erica G. Weinberger, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Nelson S. Ebaugh, Hiersche, Martens, Hayward, et al., Addison, TX, Larry Alan Levick, Gerard, Singer & Levick, Addison, TX, Russell W. Mills, Gerald P. Urbach, Hiersche, Martens, Hayward, et al., Addison, TX, Tally F. Parker, Jr., Parker & Marks, Irving, TX, Charles R. Gibbs, Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, represents creditor.

Scott D. McDonald, Gardere, Wynne & Sewell, Deirdre B. Ruckman, Gardere, Wynne & Sewell, Dallas, TX, represents debtor.

Jonathan Davidson, Digital Coast Partners, LLC, Santa Monica, CA, pro se.

### *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

Before the Court is the Debtor's Objection to Claims of Series C Preferred Stock and Warrant Holders (Claims No. 90, 91, 92, 93, 94, 95, 96, and 97), the First Omnibus Objection to Claims filed by jobs.com (collectively, the "Claim Objection"), the joinder in the Claim Objection filed by Heritage Exhibits, Inc. (the "Joinder"), and the responses to the Claim Objection filed by the Carrieri Group[1] (the "Response"). The Court has jurisdiction over the Claim Objection, the Joinder, and the Response in accordance with 28 U.S.C. §§ 1334 and 157. Resolving claim objections are core proceedings in accordance with 28 U.S.C. § 157. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law in accordance

---

1. Members of the Carrieri Group are John Carrieri, Anthony Carrieri, Steven Elliot, Dave Sergeant, Michael Slentz, and Sean Slentz (collectively, the "Carrieri Group").

with Fed.R.Civ.P. 52, made applicable here by Bankruptcy Rules 7052 and 9014.

The Court heard the Claim Objection over several days. Closing arguments were made on August 6, 2002. After careful consideration of the Claim Objection, the Joinder, the Response, the evidence, the relevant authorities, and the arguments of counsel, the Court concludes that the members of the Carrieri Group do not hold allowable claims against the Debtor.

## I. FACTUAL BACKGROUND

As part of the Merger Agreement that resulted in the Debtor's creation, the Debtor issued shares of Series C–1 preferred stock (the "C–1 Stock") to each member of the Carrieri Group. The C–1 Stock was issued subject to the terms and conditions of the Statement of Designation, Preferences and Rights of Series C–1 Preferred Stock of Opportunity Network, Inc. (the "Statement"). *See* Debtor Exhibits P & Q. The Statement contained, among other things, a redemption provision requiring the Debtor to redeem the C–1 Stock under certain circumstances. *See* Debtor Exhibit Q at ¶ 5. Specifically, the Statement provided that "[a]t any time and from time to time after March 22, 2001, upon receipt of written demand from any holder of shares of Series C–1 Preferred, the Corporation, to the extent it has legally available funds therefore, shall redeem the whole or any part of such holder's shares . . . ." *See id.*

In addition to the C–1 Stock and the Statement, each member of the Carrieri Group also received warrants for the purchase of additional preferred stock of the Debtor as part of the merger transaction. Specifically, each member of the Carrieri Group received a Series C–2 Preferred Stock Warrant (the "C–2 Warrants"), a Series C–3 Preferred Stock Warrant (the "C–3 Warrants"), and a Series C–4 Pre-

ferred Stock Warrant (the "C–4 Warrants") (collectively, the "Warrants"). *See* Debtor Exhibits R, S, & T. The Debtor agreed to repurchase the Warrants at an agreed price if it had "legally available funds" at the time of demand by the holder of the Warrants. *See id.* at ¶ 5. Demand could be made for the repurchase of the C–2 Warrants and the C–3 Warrants at any time after March 19, 2002. *See* Debtor Exhibits R & S at ¶ 5. Demand could be made for the repurchase of the C–4 Warrants at any time after March 22, 2003. *See* Debtor Exhibit T at ¶ 5. The Warrants expired on March 22, 2004. See Debtor Exhibits R, S, & T at ¶ 2.

Each member of the Carrieri Group made written demand for redemption of the C–1 Stock on or about February 20, 2001, specifying a redemption date of either March 22 or 23, 2001, and returned his stock certificate. *See* Debtor Exhibits L & M. The Debtor rejected these demands in writing (a series of letters sent by its counsel which stated that "[t]he Statement of Designation, Preferences and Rights of Series C–1 Preferred Stock sets forth the requirements that must be satisfied before a holder of Series C–1 Preferred Stock may exercise its redemption rights. It appears to jobs.com that you have failed to satisfy such requirements. As a consequence, we are returning your original . . . letter to you, and the original stock certificate that you sent to us."). *See* Debtor Exhibit N.

The Statement required that the certificate representing the C–1 Stock be returned by each holder when demand was made "duly endorsed or assigned" to the Debtor. No member of the Carrieri Group complied with this requirement when the demand for redemption was first made.

The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code

on March 15, 2001 (the "Petition Date"), a few days before the specified redemption dates (March 22 or 23, 2001) for the C–1 Stock, thereby commencing this bankruptcy case (the "Case"). On July 21, 2001, each member of the Carrieri Group filed unsecured claims against the Debtor (the "Claims") in the Case in "unknown amounts" arising from the C–1 Stock, the Statement, and the Warrants. *See* Debtor Exhibits A, B, C, D, E, F, G, & H. By letters dated March 19, 2002, each member of the Carrieri Group made demand on the Debtor for (i) repurchase of the C–2 Warrants and the C–3 Warrants, and (ii) redemption of the C–1 Stock. *See* Debtor Exhibit O. In connection with this demand for redemption of the C–1 Stock, the certificates were again returned (this time duly endorsed to the Debtor as required by the Statement).

## II. CONTENTION OF THE PARTIES

The Debtor contends that members of the Carrieri Group hold equity interests in the Debtor, not unsecured claims. Heritage agrees, but pleads in the alternative that any claims held by members of the Carrieri Group must be subordinated in accordance with § 510(b) of the Bankruptcy Code.

The members of the Carrieri Group contend that because they gave notice of their desire to compel redemption of the C–1 Stock prepetition, they held contingent, unsecured claims against the Debtor that matured post-petition in the aggregate amount of $880,000. In addition, the members of the Carrieri Group contend that because the Warrants contained a repurchase obligation, they held contingent, unsecured claims against the Debtor in the aggregate amount of $3,105,716, of which $1,320,000 arises from the demand for repurchase of the C–2 Warrants and the C–3 Warrants (which matured on March 22, 2002 after such demand) and $1,785,716 arises from the C–4 Warrants (which could not be the subject of a demand for repurchase until March 22, 2003).

## III. LEGAL ANALYSIS

### A. Preliminary Statement

The parties agree that members of the Carrieri Group either hold (i) claims against the Debtor, (ii) equity securities of the Debtor, or (iii) both. Thus, the starting point in the Court's analysis is § 101 of the Bankruptcy Code which contains definitions of both "claim" and "equity security."

Section 101(5)(A) defines claim to mean a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." This definition of claim is intentionally broad. *See In re Andrews*, 239 F.3d 708, 710 (5th Cir.2001) (section 101(5) contains the "broadest possible definition of the term 'claim' [which] captures all legal obligations of the debtor, no matter how remote or contingent"). Section 101(16) defines equity security to mean, as relevant here, "share in a corporation," *see* 11 U.S.C. § 101(16)(A), or "warrant or right, other than a right to convert, sell, or subscribe to a share, security, or interest of a ... [corporation]," *see* 11 U.S.C. § 101(16)(C).

In accordance with § 101(16)(A), the C–1 Stock is an equity security. However, for the reasons explained more fully below, the Court concludes that members of the Carrieri Group held contingent and unmatured claims against the Debtor for redemption of the C–1 Stock on the Petition Date. But, those claims are not allowable against the Debtor in accordance with § 502(b)(1) of the Bankruptcy Code.

Because of prior precedent in this District, the Court concludes that the Warrants and the right to compel repurchase of the Warrants are equity securities in accordance with § 101(16)(C) of the Bankruptcy Code until the obligation to repurchase matured, at which time they became claims. If this binding precedent did not exist, the Court would conclude that while the Warrants are equity securities in accordance with § 101(16)(C), the contractual right to compel the Debtor's repurchase of the Warrants (as set forth in the Warrants) gives rise to contingent and unmatured claims against the Debtor as of the Petition Date. But, those claims are not allowable against the Debtor in accordance with § 502(b)(1) of the Bankruptcy Code.

### B. The C–1 Stock and the Statement

█ The C–1 Stock is obviously an equity security. However, in addition to their shares of stock, the members of the Carrieri Group held, on the Petition Date, contractual rights to compel the Debtor's purchase of that stock under certain circumstances. Specifically, the Debtor agreed in the Statement to redeem the C–1 Stock if it had "legally available funds" at the time of redemption and the redeeming shareholders otherwise complied with the terms of the Statement by making a timely demand and returning "duly endorsed or assigned" shares. Thus, while their right to payment was contingent on certain things—i.e., the Debtor having "legally available funds" at the time of redemption—and their right to redeem had not matured on the Petition Date, each member of the Carrieri Group held a contingent and unmatured contractual right to payment on the Petition Date.

Moreover, it appears that the right to sell stock is excluded from the Bankruptcy Code's definition of equity security. Section 101(16)(C) provides that a "warrant or

right, *other than a right to ... purchase or sell ... a share ... or security ... of a [corporation]*," is an equity security. 11 U.S.C. § 101(16)(C) (emphasis added). Thus, in accordance with a literal reading of the Bankruptcy Code's definitions of claim and equity security, each member of the Carrieri Group held a claim against the Debtor on the Petition Date arising from the Debtor's contractual obligation to redeem or purchase the C–1 Stock held by that member.

█ However, further analysis is required to determine if these claims are allowable against the Debtor in accordance with § 502 of the Bankruptcy Code. Under the Bankruptcy Code, a proof of claim is prima facie evidence of the validity of that claim unless a party in interest objects. *See* Fed. R. Bankr.P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim"); *In re O'Connor*, 153 F.3d 258 (5th Cir.1998). Moreover, a proof of claim is deemed allowed unless an objection is filed. *See* 11 U.S.C. § 502(a). Once an objection is filed and the objectant presents evidence sufficient to overcome the claim's prima facie validity, *see In re Southland Corp.*, 160 F.3d 1054 (5th Cir. 1998); *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409 (5th Cir.1992), the party asserting the claim bears the burden of proof and must establish the validity of its claim by a preponderance of the evidence. *O'Connor*, 153 F.3d at 260.

In light of the Objection and the Joinder, the Carrieri Group had the obligation to establish the validity of the Claims. For the reasons explained below, the Court concludes that the Carrieri Group failed to carry its burden of proof.

█ A claim is not allowable against a debtor if that claim is not enforceable against the debtor under "any agreement

or applicable law." *See* 11 U.S.C. § 502(b)(1). As noted previously, the Statement required the Debtor to redeem the C–1 Stock only if the shares were returned "duly endorsed or assigned" to the corporation and the Debtor had "legally available funds" with which to make such a purchase. *See* Debtor Exhibit Q at ¶ 5(a). While the Statement does not define the term "legally available funds," the Texas Business Corporation Act ("TBCA") provides the statutory basis on which such a distribution may legally be made by a Texas corporation like the Debtor.

Specifically, article 2.38 of the TBCA provides that "[a] distribution may not be made by a corporation if: (1) after giving effect to the distribution, the corporation would be insolvent; or (2) the distribution exceeds the surplus of the corporation."[2] Tex. Bus. Corp. Act Ann. art. 2.38(B) (Vernon Supp.2002). Article 1.02(A)(13)(b) of the TBCA defines distribution to include redemption of a corporation's shares. *Id.* at art. 1.02(A)(13)(b). Moreover, article 1.02(A)(16) of the TBCA defines insolvency

to mean the "inability of a corporation to pay its debts as they become due in the usual course of its business." *Id.* at art 1.02(A)(16). Finally, article 1.02(A)(24) of the TBCA defines surplus to mean the "excess of the net assets of a corporation over its stated capital." *Id.* at art. 1.02(A)(24).

Applying these contractual and state law requirements to the Carrieri Group's first attempt to redeem the C–1 Stock as of March 22 or 23, 2001, the Court finds the attempt unenforceable against the Debtor for two reasons, either of which is sufficient to sustain the Objection. First, the members of the Carrieri Group failed to endorse or assign their shares to the Debtor as the Statement plainly required. Second, the Debtor did not have "legally available funds" with which to make the requested redemption.

■ As noted previously, the Carrieri Group had the burden to prove that the Debtor could make this distribution legal-

---

**2.** Article 2.38 of the TBCA is based on section 6.40(c) of the Revised Model Business Corporation Act which provides that:

> No distribution may be made if, after giving it effect: (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

*See* American Bar Association Revised Model Business Corporation Act, § 6.40(c). Most states have adopted this approach and have corporation statutes which limit the authority to declare dividends when a corporation is, or would be rendered, insolvent. Because redemption of its stock provides the corporation with nothing of value, *see In re Envirodyne*

*Indus. Inc.,* 79 F.3d 579 (7th Cir.1996); *Robinson v. Wangemann,* 75 F.2d 756 (5th Cir. 1935), these state law requirements are intended to insure that creditors of a corporation are not adversely affected by a decision to redeem stock. *See* 11 William Meade Fletcher, *Fletcher's Cyclopedia on the Law of Private Corporations,* § 5329 (rev. perm. ed. 1995 & Supp.2001) ("the assets of a corporation are a trust fund for the payment of its debts which cannot be lawfully distributed among the shareholders to the prejudice of creditors"); *see also Williams v. Nevelow,* 513 S.W.2d 535 (Tex.1974). While article 2.38 of the TBCA provides that a corporation's debt to a shareholder in redeeming stock is at parity with the corporation's other general unsecured creditors, that is only true if the debt is incurred—*i.e.,* the corporation was entitled to make a distribution—in accordance with article 2.38(B). *See* Tex. Bus. Corp. Act Ann. art. 2.38(E) (Vernon Supp. 2002).

ly.[3] Thus, the Carrieri Group had the burden to prove that the Debtor would not have been rendered "insolvent" by redeeming the C–1 Stock or that the amount required to redeem the C–1 Stock did not exceed the Debtor's corporate "surplus." *See* Tex. Bus. Corp. Act Ann. art. 2.38(B) (Vernon Supp.2002). While counsel for the Carrieri Group argued that the Debtor would not have been rendered insolvent by redeeming the C–1 Stock because the Debtor had assets in excess of its liabilities (essentially arguing the definition of insolvent provided in § 101(32) of the Bankruptcy Code), that is not the test for insolvency under the TBCA.

Applying instead the TBCA's definition of insolvency to the evidence before it, the Court finds that the Debtor would have been rendered insolvent by redeeming, in whole or in part, the C–1 Stock because

the Debtor would not have been able to pay its debts as they became due in the usual course of its business. In fact, it was the inability to pay its obligations as they came due in the usual course of its business that caused the Debtor to file for bankruptcy on March 15, 2001, a few days before the Carrieri Group's redemption claims matured.

Peter Gudmundsson, the Debtor's president, testified with respect to the Debtor's financial condition at the time the Debtor's board of directors made the decision to seek protection under Chapter 11 of the Bankruptcy Code. Specifically, Mr. Gudmundsson testified that in the fiscal year 2000, the Debtor had a negative cash flow from operations of "around twenty million;" that in January 2001, the Debtor had a negative cash flow from operations of $934,700; in February 2001, the Debtor

---

**3.** Although it is clear that the claimant bears the ultimate burden of persuasion with respect to a proof of claim under the Bankruptcy Code, the Court was unable to locate any Texas authority regarding who bears the burden of proof to show that the Debtor could legally make a distribution under state law. Thus, the Court turned to decisions from other jurisdictions with similar state law requirements for redemption. However, there is no consensus among the state courts as to who bears the burden of proof in an action to enforce a stock redemption agreement. Some courts have placed the burden upon the plaintiff shareholder. *See, e.g. Mindenberg v. Carmel Film Prod. Inc.*, 132 Cal.App.2d 598, 282 P.2d 1024 (1955) (burden of proving existence of corporate surplus from which corporation could repurchase stock rested on plaintiff in action against corporation for breach of contract); *Koeppler v. Crocker Chair Co.* 200 Wis. 476, 228 N.W. 130, 132 (1929) (burden is on shareholder claiming right to have stock redeemed to show that redemption can be made without prejudice to rights of creditors). Other courts have placed the burden on the corporation. *See, e.g. In re Archer*, 174 Mont. 429, 571 P.2d 379 (1977) (in action to foreclose on promissory note issued to repurchase stock, fact that repurchase occurred while

corporation was insolvent in violation of state law was affirmative defense on which corporation had burden of proof); *Nakano v. Nakano McGlone Nightingale Adv. Inc.*, 84 Misc.2d 905, 377 N.Y.S.2d 996 (N.Y.Sup.Ct.1975) (in action to enforce contract of redemption, burden is on corporation to show it would be illegal).

In light of the Court's affirmative finding that the Debtor would have been rendered insolvent by a redemption, in whole or in part, of the C–1 Stock in late March, 2001, *see* pp. 215–16, *infra,* the question of who bears the burden of proof on this issue is of no real consequence. If the Debtor had the burden of proof to establish that it could not repurchase the C–1 Stock on March 22 or 23, 2001 (or in March 2002 when the second demand for repurchase was made) in accordance with state law because it did not have "legally available funds" with which to repurchase, the Court finds that the Debtor carried its burden of proof on this issue by a preponderance of the evidence. If, however, the Court correctly placed the burden of proof on the Carrieri Group, the Court finds that they failed to establish by a preponderance of the evidence that the Debtor had "legally available funds" with which to make the requested distribution.

operated at a negative cash flow of $422,900; and in March 2001, the Debtor was projecting a negative cash flow from operations of $524,857. *See* July 1, 2002 hearing transcript[4] at p. 15; Debtor Exhibit V at p. 2. Unless something was done to enable the Debtor to drastically reduce its monthly operating expenses—*i.e.*, a Chapter 11 filing, the Debtor was projecting a cumulative negative cash flow over the next six months (April 2001—September 2001) of approximately $3,424,577, at which time the Debtor was projected to run out of cash.[5] *See* 7/1 Tr. at pp. 15–18; Debtor Exhibit V at pp. 2–3. Mr. Gudmundsson further testified that while the Debtor had retained an investment banker to assist it in its efforts to either raise money or sell its assets, there was no prospect of a cash infusion to allow the Debtor to have a positive cash flow and no buyer for its assets. *See* 7/1 Tr. at p. 15. Mr. Gudmundsson testified that members of the board of directors believed that jobs.com was in the zone of insolvency at the time of their meeting on March 14, 2001 and thus believed that their fiduciary duty "had expanded from just the equity holders to all stakeholders, which included creditors" based "on advise of counsel, and given the experience of many board members." *See* 7/1 Tr. at p. 16. Finally, Mr. Gudmundsson testified that while a check in the amount required to redeem the C–1 Stock (approximately $1,000,000) would have cleared the bank in late March 2001, the result of such a redemption would have been to cause the Debtor to run out of cash "closer to June rather than August"

2001. *See* 7/1 Tr. at p. 22. Unable to operate at all at that point, the Debtor would have jeopardized its most valuable asset, the advertising agreement with CBS, which required that the Debtor keep its website operating at least 97% of the time and the Debtor would not have been able to pay its creditors as their claims arose. *See id.*

Based upon this credible testimony, the Court finds that the Debtor would have been rendered insolvent by a redemption, in whole or in part, of the C–1 Stock on March 22 or 23, 2001 in that the Debtor would have been unable to continue its operations and pay its debts as they became due in the usual course of its business. As a result, the only basis upon which the redemption of the C–1 Stock would have been legally proper is if the amount required to redeem was less than the Debtor's corporate "surplus." The Carrieri Group offered no evidence regarding the calculation of the Debtor's corporate rate "surplus;" and thus, the Carrieri Group failed to carry their burden of proof.[6]

For these reasons, the Claims relating to the first demand for redemption of the C–1 Stock are not enforceable against the Debtor and must be disallowed in accordance with § 502(b)(1) of the Bankruptcy Code.

Turning now to the second demand for redemption of the C–1 Stock in late March 2002, the Court finds this demand equally unenforceable against the Debtor. Once

4. Hereinafter, this hearing transcript is cited as 7/1 Tr.

5. This financial data assumed no cash was spent redeeming the C–1 Stock.

6. Similarly, the Debtor did not offer any evidence with respect to the calculation of its corporate surplus. Unlike the evidence with respect to insolvency (where the Court has found that the Debtor affirmatively proved that it would have been rendered insolvent by redemption of the C–1 Stock), if the Court has incorrectly placed the burden of proof on the Carrieri Group as to corporate surplus, the Debtor did not prove that the amount required to redeem the C–1 Stock was in excess of its corporate surplus.

again, in late March 2002, the Debtor did not have "legally available funds" with which to make the requested redemption and the claims must be disallowed.

If not actually known at the time the Case was filed, shortly thereafter it became clear that the Debtor would not be able to reorganize as an operating entity. Rather, the Debtor embarked upon a strategy to maximize the value of its assets so that they could be sold with the proceeds distributed in accordance with the Bankruptcy Code's absolute priority rule. While certain members of the Carrieri Group disagreed and thought that the Debtor should be able to reorganize and emerge as an operating entity, and the Court terminated exclusivity so that they could propose an operating plan of reorganization for the Debtor, no such plan was ever formulated and filed.

Instead, the Debtor filed motions relating to the sale of its assets in August 2001. After significant litigation with CBS over an advertising agreement CBS had with the Debtor and whether that agreement could be sold (or assumed and assigned) by the Debtor, the litigation was settled and CBS bought back its advertising agreement for approximately $4.4 million in cash and debt forgiveness. The Debtor's other assets were sold, after notice and hearing, by Order entered on March 4, 2002.

By late March 2002, the Debtor was close to finalizing its proposed Chapter 11 plan of liquidation. That plan and its attendant disclosure statement were filed on April 8, 2002. An amended disclosure statement was approved by Order entered on May 9, 2002 and the plan was confirmed by Order entered on June 27, 2002. While the Carrieri Group objected to confirmation, that objection was designed to protect its members' right to participate as creditors under the plan if they held allowable, non-subordinated claims against the Debtor.[7]

On this record, the Carrieri Group failed to establish by a preponderance of the evidence that the Debtor either (i) would not have been rendered insolvent by a redemption, in whole or in part, of the C–1 Stock in late March 2002, or (ii) would have had a corporate "surplus" in late March 2002 (after giving effect to the proposed redemption). For this reason, the Claims relating to the second demand for redemption of the C–1 Stock are not enforceable against the Debtor and must be disallowed in accordance with § 502(b)(1) of the Bankruptcy Code.

## C.  The Warrants

■  The Bankruptcy Code is clear, warrants are equity securities. *See* 11 U.S.C. § 101(16)(C). So—does the warrant holder's contractual right to compel a cash repurchase of the warrant change its proper characterization under the Bankruptcy Code?

A number of courts have held that warrants with redemption features remain equity securities until they mature or expire. For example, in *In re Search Financial Services Acceptance Corp.*, 2000 WL

---

7. The Carrieri Group objected to confirmation on the ground that, *inter alia*, the plan "classifies [its] claims as Class 5 Series C Preferred Equity Interests without indicating that the claims are disputed and does not provide for the possibility that resolution of the Debtor's objection to the claims could result in the classification and payment of the Carrieri Group's claims as Class 3 General

Unsecured Creditors." *See* Carrieri Group's Obj. to Confirmation of Debtor's First Amended Chapter 11 Plan of Liquidation, p. 2, ¶ 5. At the confirmation hearing, the parties agreed that if the Carrieri Group claims are allowed and not otherwise subordinated, they will be treated in Class 3 as general unsecured claims.

256889 (N.D.Tex. Mar.7, 2000), the court concluded that warrants containing a redemption feature (which did not mature[8] for an additional three years after the filing of the bankruptcy case) were properly characterized and treated as equity interests in the debtor's plan. In reaching this conclusion, the *Search Financial* court distinguished the holdings in *In re Main Street Brewing Co., Ltd.,* 210 B.R. 662 (Bankr.D.Mass.1997), which had held that where the agreement to repurchase warrants had matured prior to the bankruptcy filing, the resulting debt must be subordinated to the claims of other creditors,[9] and *In re Baldwin–United Corp.,* 52 B.R. 549 (Bankr.S.D.Ohio 1985), which had held that option holders become unsecured creditors only after their right to receive a cash payment matured. Moreover, in *In re Einstein/Noah Bagel Corp.,* 257 B.R. 499 (Bankr.D.Ariz.2000), the court concluded that a put right[10] which had not matured at the time of the commencement of the case was an equity interest. While dicta, the *Noah Bagel* court further stated, relying on the *Search Financial* holding, that:

> even if the Put Right could be construed to contain an obligatory cash payment (which it does not), that would not change its nature from an equity security to a claim because **at the time the case was filed,** the right to receive the

cash would not have matured because the Put Right itself had not yet become exercisable, a fact that is undisputed in this litigation.

*Id.* at 507 (emphasis in original).

This Court has previously held that decisions from a United States District Court in this District on appeal are binding precedent on bankruptcy courts in this District. *See In re Rand Energy Co.,* 259 B.R. 274 (Bankr.N.D.Tex.2001) (Felsenthal, J.). Thus, consistent with the District Court's decision on appeal in *Search Financial,* 2000 WL 256889, at *3, this Court concludes that notwithstanding the mandatory repurchase obligation, the Warrants remained equity interests in the Debtor until the repurchase obligation matured.[11]

Applying that holding to each series of warrants at issue here, the Court will address the easiest issue first—*i.e.,* the C–4 Warrants. Demand for repurchase of the C–4 Warrants could not be made by members of the Carrieri Group until March 19, 2003. Thus, the right to compel the Debtor's repurchase of the C–4 Warrants had not matured when the Case was filed or when the plan was confirmed. Confirmation of the plan "terminate[d] all rights and interests of equity security holders ... provided for by the plan," including the right to demand repurchase of the C–4

---

8. If not exercised at maturity, the debtor in *Search Financial* had agreed to redeem the warrants for 25 cents per share.

9. The *Main Street Brewing* court did not specifically address the significance of the prefiling maturity of the obligation to redeem to its decision. The *Search Financial* court characterized the holding in *Main Street Brewing* as "the court essentially held that a warrant providing for mandatory redemption becomes a liability only after it expires." *Search Financial,* 2000 WL 256889, at *3.

10. However, under the governing agreement, the holder of the put could not compel a cash payment for its shares.

11. While the *Search Financial* court's holding is phrased in terms of the expiration of the warrants, in that case the debtor's obligation to purchase arose or matured upon the expiration of the warrants. Here, however, the Debtor's repurchase obligation arises upon timely demand prior to the expiration of the Warrants. In fact, all rights (to either exercise the Warrants or demand a repurchase) terminate upon the expiration of the Warrants.

Warrants on and after March 19, 2003. *See* 11 U.S.C. § 1141(d)(1)(B). As a result, the C–4 Warrants and the right to demand repurchase of those warrants remained equity interests in the Debtor until those interests were terminated by confirmation of the plan.

■ Turning next to the C–2 Warrants and the C–3 Warrants, the Court concludes, consistent with the District Court's holding in *Search Financial*, that the C–2 Warrants and the C–3 Warrants were equity securities on the Petition Date notwithstanding the Debtor's repurchase obligation because the obligation to repurchase had not matured on the Petition Date. However, consistent with their contractual rights, members of the Carrieri Group demanded repurchase of the C–2 Warrants and the C–3 Warrants on March 22, 2002. Thus, as of March 22, 2002, members of the Carrieri Group held a right to payment from the Debtor for the repurchase of the C–2 Warrants and the C–3 Warrants. While contingent (as will be discussed more fully below) and unmatured on the Petition Date, after demand was made on March 22, 2002, members of the Carrieri Group held claims against the Debtor.

This result is consistent with § 101(16)(C) of the Bankruptcy Code which defines "equity security" to mean "warrant or right, *other than a right to . . . sell . . . a . . . security . . . of a . . . [corporation].*" 11 U.S.C. § 101(16)(C) (emphasis added). In turn, § 101(49)(xv) of the Bankruptcy Code defines "security" to include a warrant. *See* 11 U.S.C. § 101(49)(xv). Thus, a right to sell a warrant, once matured, is not an equity security.

Like the claims arising from the Debtor's obligation to redeem the C–1 Stock, the claims arising from the Debtor's obligation to repurchase the C–2 Warrants and the C–3 Warrants are not "allowable" claims if they are not enforceable against the Debtor under either the parties' agreement or applicable state law. *See* 11 U.S.C. § 502(b)(1); *see also supra* at pp. 213–15. In accordance with the terms of the C–2 Warrants and the C–3 Warrants, the Debtor's obligation to repurchase was contingent on it having "legally available funds" with which to make such a purchase. Once again, while the C–2 Warrants and the C–3 Warrants do not define the term "legally available funds," the TBCA provides the statutory basis on which such a distribution may legally be made by the Debtor.

As noted previously, in accordance with article 2.38 of the TBCA, a distribution may not be made if, after giving effect to the distribution, the corporation would be insolvent or the distribution would exceed the surplus of the corporation. Tex. Bus. Corp. Act Ann. art 2.38(B) (Vernon Supp. 2002). A corporation's repurchase of its warrants is a distribution. *See id.* at art. 1.02(A)(13)(b).

Applying these contractual and state law requirements to the Carrieri Group's demand for repurchase of the C–2 Warrants and the C–3 Warrants, the Court finds the demand for repurchase unenforceable against the Debtor for the same reason that the demand for redemption of the C–1 Stock was unenforceable against the Debtor—*i.e.,* the Debtor did not have "legally available funds" with which to repurchase the warrants in late March, 2002.

In short, the Carrieri Group failed to establish by a preponderance of the evidence that the Debtor either (i) would not have been rendered insolvent by a repurchase of the C–2 Warrants and the C–3 Warrants in late March 2002, or (ii) would have had a corporate "surplus" in late March 2002 (after giving effect to the pro-

posed repurchase). For this reason, the claims arising from the request for repurchase of the C–2 Warrants and the C–3 Warrants are not enforceable against the Debtor and must be disallowed in accordance with § 502(b)(1) of the Bankruptcy Code.

If this Court was not bound by the District Court's decision in *Search Financial*, it would hold that the contractual right to compel a repurchase of the Warrants in cash at an agreed price gave rise to contingent and unmatured claims against the Debtor on the Petition Date. While the Court struggled with the seeming unfairness of holders of equity securities (here, the C–1 Stock and the Warrants) being able to convert those equity securities into claims around or after the time of a bankruptcy filing (and thereby dilute the recoveries of other unsecured creditors), the Court believes that such a holding is consistent with the Bankruptcy Code as a whole and notes, importantly, that applicable state law and/or the Bankruptcy Code itself provide the means by which to insure that other unsecured creditors are not unfairly diluted. In short, the *Search Financial* outcome—*i.e.*, no recovery to the holders of warrants with mandatory redemption provisions until other unsecured creditors are paid in full—can be achieved in a way which this Court respectfully suggests is more consistent with the terms of the Bankruptcy Code taken as a whole.

Thus, if free to write on a clean slate, this Court would hold that the contractual right to compel the Debtor's purchase of the Warrants in cash at an agreed price gave rise to a "claim" against the Debtor as that term is defined in § 101(5)(A) of the Bankruptcy Code. Specifically, each member of the Carrieri Group held a "right to payment" on the Petition Date that was contingent on the Debtor having "legally available funds" when demand was

made for repurchase and, since the time for demand had not yet passed, the claim was unmatured on the Petition Date. The fact that the Carrieri Group's right to payment was contingent and unmatured as of the Petition Date is of no legal consequence. The Bankruptcy Code defines "claim" to include contingent and unmatured rights to payment. *See* 11 U.S.C. § 101(5)(A). However, notwithstanding the fact that an entity may have a claim against a debtor, that entity's claim is not allowable in a bankruptcy case (and thus the claimant does not participate in distributions under a plan) unless the claim is enforceable against the debtor under an agreement or applicable nonbankruptcy law. *See* 11 U.S.C. § 502(b)(1).

Thus, notwithstanding the fact that the Court would have concluded that each member of the Carrieri Group held a claim against the Debtor for the repurchase of the Warrants, those claims would not have been allowable against the Debtor in accordance with § 502(b)(1) of the Bankruptcy Code for the reasons explained below. Thus, members of the Carrieri Group would not have been entitled to participate in distributions for holders of allowable unsecured claims under the plan.

Demand for repurchase of the C–4 Warrants could not be made until March 22, 2003. Thus, until demand could properly be made for repurchase under the terms of the C–4 Warrants, the claim would not be enforceable against the Debtor. Moreover, confirmation of the plan terminated the C–4 Warrants and any rights associated with such warrants, including the right to demand repurchase by the Debtor. *See* 11 U.S.C. § 1141(d)(1)(B).

As noted previously, while demand for repurchase of the C–2 Warrants and the C–3 Warrants was made on March 22, 2002, another condition to the Debtor's obligation to repurchase was not satisfied. Specifically, the Debtor did not have legal-

ly available funds (as that term is defined under Texas state law) with which to make such a purchase at the time of demand. Thus, the Carrieri Group's claims related to the demand for repurchase of the C–2 Warrants and the C–3 Warrants were unenforceable against the Debtor under both their agreement and Texas state law and were not allowable claims in the Case in accordance with § 502(b)(1) of the Bankruptcy Code.

In addition to the Bankruptcy Code's protection that claims must be enforceable against the debtor under an agreement or applicable nonbankruptcy law to be allowable in a bankruptcy case, the Code provides yet another protection to unsecured creditors who might be adversely affected by claims which arise from equity securities. Specifically, § 510(b) provides:

> [f]or the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

After taking the definitions of claim, equity security, and security (set forth in § 101 of the Bankruptcy Code) into consideration, together with the Bankruptcy Code's provisions for allowance of claims (§ 502(b)) and mandatory subordination of claims (§ 510(b)), this Court concludes that the better reading of the Bankruptcy Code as a whole is that members of the Carrieri Group hold claims against the Debtor related to their right to compel repurchase of the Warrants but that such claims are not enforceable against the Debtor and thus are not allowable in the Case. Under this interpretation of the Bankruptcy Code, other unsecured creditors are protected from the Carrieri Group's claims through the claims allowance process.[12]

## IV. CONCLUSION

Members of the Carrieri Group held Claims against the Debtor on the Petition Date related to their right to compel redemption of the C–1 Stock. However, those Claims are not enforceable against the Debtor under the applicable agreement and Texas state law. Thus, the Claims are not allowable in the Case in accordance with § 502(b)(1) of the Bankruptcy Code and shall not participate in distributions under the confirmed plan of liquidation for the Debtor.

Based upon prior precedent in this District, the Warrants and the right to compel repurchase of the Warrants are equity securities in accordance with § 101(16)(C) of the Bankruptcy Code until the obligation to repurchase matured, at which time they

---

**12.** In a case where claims arising from a debtor's obligation to redeem or repurchase equity securities are allowable in the bankruptcy case—*i.e.*, the claims are enforceable against the debtor under an agreement or applicable nonbankruptcy law consistent with § 502(b)(1) of the Bankruptcy Code, those claims should be entitled to participate in distributions with other unsecured creditors unless the claims fall within the provisions for mandatory subordination required by § 510(b) of the Bankruptcy Code. This result is consistent with Texas state law which provides that if a corporation can properly make a "distribution" to a shareholder (which is defined to include redemption or repurchase of shares or warrants), a debt to the shareholder for the distribution is at parity with the corporation's debt to its general, unsecured creditors. *See* Tex. Bus. Corp. Act Ann. art. 2.38(E) (Vernon Supp.2002).

became claims. If this binding precedent did not exist, the Court would hold that while the Warrants are equity securities in accordance with § 101(16)(C), the contractual right to compel the Debtor's repurchase of the Warrants (as set forth in the Warrants) gives rise to contingent and unmatured claims against the Debtor as of the Petition Date. However, those Claims are not enforceable against the Debtor under the applicable agreement and/or Texas state law. Thus, the Claims are not allowable in the Case in accordance with § 502(b)(1) of the Bankruptcy Code and shall not participate in distributions under the confirmed plan of liquidation for the Debtor.

An Order consistent with the terms of this Memorandum Opinion will be entered separately.