John CARRIERI, et al., Appellants,

v.

JOBS.COM, INC., et al., Appellees.

No. 4:03–CV–032–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Oct. 31, 2003.

Gerald P. Urbach, Russell W. Mills, Laurie A. Spindler, Hiersche, Hayward, Drakeley & Urbach, P.C., Addison, TX, for Appellants.

Appellee jobs.com, Inc., Deirdre B. Ruckman, Stacy R. Obenhaus; Gardere Wynne Sewell, L.L.P., Arthur J. Kania and The Kania Trust: Keith Miles Aurzada, Charles Gibbs & Randell J. Gartin, Akin Gump Strauss Hauer & Feld, LLP, Dallas, TX, for Appellees.

### MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

This case is an appeal from rulings made by the bankruptcy court disallowing claims of a group of creditors known as the Carrieri Group in the jobs.com, Inc., Chapter 11

proceeding by a memorandum opinion[1] signed by the bankruptcy judge, the Honorable Barbara J. Houser, on September 10, 2002, and in a separate order of that same date. The appellants, John Carrieri, Anthony Carrieri, Steven M. Elliot, Dave Sergeant, Michael Slentz, and Sean Slentz, are members of the Carrieri Group. The appellees are the debtor, jobs.com, Inc., and Arthur J. Kania and the Kania Trust, who are creditors whose claims would be adversely affected if the court were to reverse the rulings of the bankruptcy court.

The court has concluded that the bankruptcy court did not err in disallowing appellants' claims.

## I.

### *Factual Background*

A. *Overview.*

As an overview of the pertinent facts, the court adopts the bankruptcy court's description of the factual background as follows:

As part of the Merger Agreement that resulted in the Debtor's creation, the Debtor issued shares of Series C–1 preferred stock (the "C–1 Stock") to each member of the Carrieri Group. The C–1 Stock was issued subject to the terms and conditions of the Statement of Designation, Preferences and Rights of Series C–1 Preferred Stock of Opportunity Network, Inc. (the "Statement"). The Statement contained, among other things, a redemption provision requiring the Debtor to redeem the C–1 Stock under certain circumstances. Specifically, the Statement provided that "[a]t any time and from time to time after March 22, 2001, upon receipt of written demand from any holder of shares of Series C–1 Preferred, the Corporation, to the ex-

tent it has legally available funds therefore, shall redeem the whole or any part of such holder's shares...."

In addition to the C–1 Stock and the Statement, each member of the Carrieri Group also received warrants for the purchase of additional preferred stock of the Debtor as part of the merger transaction. Specifically, each member of the Carrieri Group received a Series C–2 Preferred Stock Warrant (the "C–2 Warrants"), a Series C–3 Preferred Stock Warrant (the "C–3 Warrants"), and a Series C–4 Preferred Stock Warrant (the "C–4 Warrants") (collectively, the "Warrants"). The Debtor agreed to repurchase the Warrants at an agreed price if it had "legally available funds" at the time of demand by the holder of the Warrants. Demand could be made for the repurchase of the C–2 Warrants and the C–3 Warrants at any time after March 19, 2002. Demand could be made for the repurchase of the C–4 Warrants at any time after March 22, 2003. The Warrants expired on March 22, 2004.

Each member of the Carrieri Group made written demand for redemption of the C–1 Stock on or about February 20, 2001, specifying a redemption date of either March 22 or 23, 2001, and returned his stock certificate. The Debtor rejected these demands in writing (a series of letters sent by its counsel which stated that "[t]he Statement of Designation, Preferences and Rights of Series C–1 Preferred Stock sets forth the requirements that must be satisfied before a holder of Series C–1 Preferred Stock may exercise its redemption rights. It appears to jobs.com that you have failed to satisfy such requirements. As a consequence, we are returning your original ... letter to you, and the origi-

---

1. The bankruptcy court's memorandum opin- ion is reported at 283 B.R. 209.

nal stock certificate that you sent to us.").

The Statement required that the certificate representing the C–1 Stock be returned by each holder when demand was made "duly endorsed or assigned" to the Debtor. No member of the Carrieri Group complied with this requirement when the demand for redemption was first made.

The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on March 15, 2001 (the "Petition Date"), a few days before the specified redemption dates (March 22 or 23, 2001) for the C–1 Stock, thereby commencing this bankruptcy case (the "Case"). On July 21, 2001, each member of the Carrieri Group filed unsecured claims against the Debtor (the "Claims") in the Case in "unknown amounts" arising from the C–1 Stock, the Statement, and the Warrants. By letters dated March 19, 2002, each member of the Carrier Group made demand on the Debtor for (i) repurchase of the C–2 Warrants and the C–3 Warrants, and (ii) redemption of the C–1 Stock. In connection with this demand for redemption of the C–1 Stock, the certificates were again returned (this time duly endorsed to the Debtor as required by the Statement).

*In re jobs.com, Inc.*, 283 B.R. 209, 211–12 (Bankr.N.D.Tex.2002) (record references omitted).[2]

**2.** The court questions the accuracy of the bankruptcy court's statement that the March 19, 2002, letters included a demand for "redemption of the C–1 Stock." *In re jobs.com, Inc.*, 283 B.R. 209, 212 (Bankr.N.D.Tex.2002). The reference in the March 19, 2002, letters to the C–1 shares appears to be but an effort to bolster the February 20, 2001, attempt to cause redemption of the C–1 shares. The only part of the March 19 letters mentioning the C–1 shares reads as follows:

I am also returning to you my Certificate for Class C–1 shares which I tendered for

## B. *The Proofs of Claim and Objections Thereto.*

Except for differences in the names of the creditors, the proofs of claim filed by appellants on July 21, 2001, are identical. In each instance, the basis for the claim was stated to be as follows:

[Name of creditor], the holder of shares of Series C–1—C–4 preferred stock, hereby asserts an unsecured, nonpriority claim in an unknown amount against the Debtor for all claims, rights and obligations arising under the Articles of Incorporation, Statement of Designation, Preferences and Rights, Preferred Stock Warrants, Merger Agreement, Voting Agreement and all related documents, including, without limitation, all rights of redemption.

Ex. "A" (R. Vol. 7 at 1418), Ex. "B" (R. Vol. 7 at 1420, Ex. "C" (R. Vol. 7 at 1422), Ex. "D" (R. Vol. 7 at 1424), Ex. "E" (R. Vol. 7 at 1426), and Ex. "H" (R. Vol. 7 at 1432).

Debtor objected to the claims on the grounds that "each Claimant was the holder of an interest in the Debtor, rather than a general unsecured claim against it," that "[u]nder the Bankruptcy Code, claims and interests are determined as of the date of filing of a debtor's petition," and that "although the Claimants' equity interests were subject to redemption rights, those

redemption by letter dated February 20, 2001. I believe this Certificate was returned to me in error by your law firm. It is enclosed so that you are clear that I have always intended to exercise my right to have the Corporation redeem my C–1 preferred stock as evidenced by the Proof of Claim filed on my behalf in the bankruptcy case.

Ex. "O" (R. Vol. 7 at 1528, 1554, 1581, 1607, 1633, 1659).

rights had not accrued as of the Petition Date," with the consequence that "each Claimant possesses only an equity interest in the Debtor, and, to the extent the Claimants seek treatment as general unsecured creditors, each of the Claims should be disallowed in its entirety." Ex. "J" (R. Vol. 7 at 1466–67).

## C. *The Bankruptcy Court's Ultimate Ruling.*

The bankruptcy court signed an order September 10, 2002, by which it, consistent with its memorandum opinion of that same date, disallowed the claims of the Carrieri Group.

## II.

### *Issues on Appeal*

Appellants raise in their brief the following issues on appeal:

1. Did the Bankruptcy Court err in disallowing the claims of the Appellants ("Carrieri Claims") which matured after the filing of Appellee jobs.com's (the "Debtor["] or "jobs.com") bankruptcy case by determining that no "legally available funds" existed pursuant to the Texas Business Corporation Act (the "TBCA") rather than applying bankruptcy law or other Texas law?

2. Assuming *arguendo* that the TBCA was applicable, did the Bankruptcy Court err in disallowing the claims of the Appellants by determining that "legally available funds" were not available to redeem in whole or in part the preferred shares and warrants of the Appellants because Appellee jobs.com was insolvent or would have been rendered insolvent as defined under the TBCA at the time demand was made to pay the claims or at the time the claims matured?

3. Assuming *arguendo* that Texas law was applicable, did the Bankruptcy Court err in disallowing the claims of the Appellants by determining that "legally available funds" were not available to redeem in whole or in part the preferred shares and warrants of the Appellants because Appellee jobs.com did not have a "surplus" as defined by the TBCA at the time demand was made to pay the claims or at the time the claims matured?

4. Did the Bankruptcy Court err in disallowing the Appellants' claims with regard to the redemption of the C–1 preferred shares because of their failure to endorse the stock certificates when they first attempted to redeem such shares?

5. In the event that the Bankruptcy Court held that the right to redeem the C[-]2 and C–3 warrants was equity rather than a debt claim (which Appellants believe the court did not hold), did the Bankruptcy Court err in disallowing the Appellants' claims with regard to the C–2 and C–3 warrants because the right to redeem such warrants was an unmatured claim on the Petition Date, which matured on March 22, 2002, after the Petition Date and before the plan of reorganization was confirmed?

Br. of Appellants at 1–2.

## III.

### *Standard of Review*

 To the extent the appeal presents questions of law, the bankruptcy court's judgment is subject to *de novo* review. *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1252 (5th Cir.1986). Findings of fact, however, will not be set aside unless clearly erroneous. *Memphis– Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways,*

*Inc.)*, 783 F.2d 1283, 1287 (5th Cir.1986). A finding is clearly erroneous, although there is evidence to support it, when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* The mere fact that this court would have weighed the evidence differently if sitting as the trier of fact is not sufficient to set aside the bankruptcy court's order if that court's account of the evidence is plausible in light of the record viewed in its entirety. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

## IV.

### *The Automatic Stay Issue Raised Sua Sponte by the Court*

■ In proceedings before the bankruptcy court, the bankruptcy judge suggested the possibility that the automatic stay existing by reason of the filing by debtor of its voluntary petition in March of 2001, *see* 11 U.S.C. § 362(a), was violated by the exercise by appellants in March 2002 of their contractual rights to demand repurchase by the debtor of their C–2 and C–3 warrants, Supp. R. Vol. 1 at 85–87; R. Vol. 4 at 789. While the subject of a possible violation of the automatic stay was not raised by either side in the appellate briefs, the court, *sua sponte*, concluded that the issue should be explored. Pursuant to a directive of the court, the parties

filed post-briefing memoranda on that subject.

Upon further study, the court has concluded that the possibility of a violation of the automatic stay is not a proper issue for consideration on this appeal. The bankruptcy court did not base any ruling on an asserted violation of the automatic stay. Apparently appellees did not contend in the bankruptcy court that there was such a violation, nor did they take such a position in their answering briefs on appeal. Moreover, even if the March 2002 letter demands were viewed to be in violation of the automatic stay,[3] the demands would not be void, but merely voidable. *See In re Jones*, 63 F.3d 411, 412 (5th Cir.1995). No one has taken any action to cause the demands to be voided. Finally, the court has concluded that, in any event, the March 2002 letter demands cannot serve as bases for appellants' claims in bankruptcy. For those reasons, the court is not considering further the possibility that the demands violated the automatic stay.

## V.

### *Analysis*

A. *The Bankruptcy Court's Analysis of the C–1 Stock and the Statement.*

■■ Without question, the C–1 shares are "equity securities." 283 B.R. at 213. And, as the bankruptcy court found, "in addition to their shares of stock, the members of the Carrieri Group held, on the

---

**3.** The March 19, 2002, demand letters disclose that the Carrieri Group was concerned that the demand letters might be viewed to be in violation of the automatic stay, saying in their concluding paragraphs that:

The undersigned acknowledges that Jobs. Com is in bankruptcy proceedings in Case No. 01–41861–BJH–11. This notice is intended to comply with the notice provisions of the Statement and is not intended to violate the automatic stay. The undersigned acknowledges that so long as Jobs.

Com is in Chapter 11, payment of the redemption price can only occur upon order of the Bankruptcy Court.
Ex. "O" (R. Vol. 7 at 1528, 1554, 1581, 1607, 1633, 1659). The court finds unnecessary a discussion of the effect, if any, this language would have on the demands made by the March 19, 2002, letters if, in fact, they otherwise would violate the automatic stay. The argument might be made that, in such an event, the quoted language would negate the demands made by the letters.

Petition Date, contractual rights to compel the Debtor's purchase of that stock under certain circumstances." *Id.* The bankruptcy court erred, however, in concluding that such rights to sell stock were excluded from the Bankruptcy Code's definition of equity security. In so concluding, the bankruptcy court apparently misread the definition, which, in pertinent part, reads:

(16) *"equity security" means*—

. . . .

(C) warrant or *right,* other than a right to convert, *to* purchase, *sell,* or subscribe to *a* share, *security,* or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

11 U.S.C. § 101(16) (emphasis added). The phrase "other than a right to convert" restricts the word "right,"[4] but the definition then resumes with the words "to purchase, sell, or subscribe to ..." for a listing of the kinds of rights the definition covers. *See, e.g., In re Am. W. Airlines, Inc.,* 179 B.R. 893, 897 (Bankr.D.Ariz. 1995). The bankruptcy court's reading of subsection (C) incorrectly treats the listing as a continuation of the restriction.[5]

Plainly, appellants' right to require repurchase of their C–1 shares was a "right ... to ... sell ... a ... security...." That is, appellants had, in the C–1 shares and attendant contractual rights, "equity security" as defined in the Bankruptcy Code. *Id.*

**B. *The Warrants.***

As discussed, the Bankruptcy Code defines "equity security" to include a warrant. "In corporate jargon, a warrant is an option to purchase stock at a given price." *Bradford v. Crown–Bremson Indus., Inc.,* 255 F.Supp. 1009, 1012 (M.D.Tenn.1964). Here, each appellant is the owner of a "series C–2 preferred stock warrant," a "series C–3 preferred stock warrant," and a "series C–4 preferred stock warrant." Each of the preferred stock warrants contains a repurchase provision pursuant to which the holder may demand repurchase of the warrant at a particular price. The C–2 and C–3 warrants provide that demand for repurchase may be made "[a]t any time and from time to time after March 19, 2002." R. Vol. 8 at 1705 & 1807. A demand for repurchase of the C–4 warrant could be made at "any time and from time to time after March 22, 2003." *Id.* at 1911.

The bankruptcy court determined that the repurchase rights as to the C–2 and C–3 warrants became claims after demand for repurchase was made by letters dated March 22, 2002. 283 B.R. at 219. The court reasoned that its conclusion was consistent with the *definition of equity security,* which the court had misread.[6] As with

---

**4.** This restriction is intended to eliminate from the "equity security" definition investment instruments such as convertible debentures. *See* S.Rep. No. 989, 95th Cong.2d Sess. (1978), 1978 U.S.Code Cong. & Admin.News 5810.

**5.** In support of its conclusion that the Carrieri Group's right to compel the debtor's purchase of the C–1 shares did not constitute "equity security," the bankruptcy court explained:

Moreover, it appears that the right to sell stock is excluded from the Bankruptcy Code's definition of equity security. Section 101(16)(C) provides that a "warrant or

right, *other than a right to ... purchase or sell ... a share ... or security ... of a [corporation],"* is an equity security. 11 U.S.C. § 101(16)(C) (emphasis added).

*In re jobs.com, Inc.,* 283 B.R. at 213.

**6.** By way of explanation of its conclusion that the repurchase demand features of the C–2 and C–3 warrants did not come within the Bankruptcy Code's definition of "equity security," the bankruptcy court explained:

This result is consistent with § 101(16)(C) of the Bankruptcy Code which defines "equity security" to mean "warrant or right, *other than a right to ... sell ... a ...*

the C–1 rights, the rights to demand repurchase of the warrants clearly fall within the definition of "equity security." As the bankruptcy court noted, a warrant is a security. *Id.;* 11 U.S.C. § 101(49)(xv). And, the definition of equity security includes a warrant or right to sell a security. 11 U.S.C. § 101(16)(C).

C. *Whether Equity Securities and Claims are Mutually Exclusive in the Bankruptcy Claim Context.*

■ Having concluded that all of the interests at issue are equity securities, the court next considers whether any of the rights held by appellants could also be claims. The rights of redemption and to require repurchase seem to come within the Bankruptcy Code's definition of "claim," 11 U.S.C. § 101(5)(A), as well as its definition of "equity security." Thus, the issue becomes the proper treatment to give a right or interest in the debtor that fits the statutory definitions of both "claim" and "equity security." The cases the court has found most nearly in point recognize only that an equity security holder might also have an independent claim. *See, e.g., In re St. Charles Pres. Investors Ltd.,* 112 B.R. 469, 474 (D.D.C. 1990); *IDS Holding Co., L.L.C. v. Madsen (In re IDS Holding Co., L.L.C.),* 292 B.R. 233, 238 (Bankr.D.Conn.2003).[7] And, other cases have discussed the possibility that an equity interest might convert to a claim at some point in time. *Duel Glass v. Search Fin. Servs., Inc. (In re Search Fin. Servs. Acceptance Corp.),* 2000 WL 256889, at *3–*4 (N.D.Tex.2000); *In re*

*Einstein/Noah Bagel Corp.,* 257 B.R. 499, 507 (Bankr.D.Ariz.2000); *but see In re Revco D.S., Inc.,* 118 B.R. 468, 474–75 (Bankr.N.D.Ohio 1990), and *In re Joshua Slocum Ltd.,* 103 B.R. 610, 623 (Bankr. E.D.Pa.1989) (both holding that redemption rights of preferred stockholders are properly characterized as security interests and not claims).

■ After considering the various authorities, the court concludes that the equity security status of an interest will prevail over the claim status of the same interest if it is an interest in the debtor. *See Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship),* 240 B.R. 124, 138–39 (Bankr.D.C.1999). This is consistent with the contemplation of the Bankruptcy Code that holders of equity interests in the debtor are not entitled to participate as meaningfully in a bankruptcy case as are holders of claims for debts owed. *Id. See In re Joshua Slocum, Ltd.,* 103 B.R. at 623 (equity security holders do not receive distribution until after a debtor's creditors have been satisfied).

## VI.

### Conclusion

For the reasons given above, the bankruptcy court did not err in disallowing appellants' claims in their entirety. Therefore,

The court ORDERS that the order of the bankruptcy court disallowing the claims of appellants be, and is hereby, affirmed.

---

*security ... of a ... [corporation]."* 11 U.S.C. § 101(16)(C) (emphasis added). *In re jobs.com, Inc.,* 283 B.R. at 219.

7. Appellants in this case do not have such claims independent of their preferred stock interests. Rather, their rights are the kind described by § 101(16)(C). The C–1 right is a right to sell preferred stock; the C–2, C–3,

and C–4 rights are rights to sell the respective warrants. The case is thus unlike *In re Baldwin* where certain option holders had a guaranteed right to cash payments and thus became unsecured creditors when those rights matured and were exercised. 52 B.R. 549 (Bankr.S.D.Ohio 1985).

## FINAL JUDGMENT

Consistent with the memorandum opinion and order signed by the court on the date of the signing of this final judgment,

The court ORDERS, ADJUDGES, and DECREES that the bankruptcy court's disallowance of appellants' claims in their entirety be, and is hereby, affirmed.